## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA**

**v.**

**SCOTT CHARLES MADDOX**
  **and**
**JANICE PAIGE CARTER-SMITH**

                 /

**SEALED**
**INDICTMENT**

4:18cr76-MW

**THE GRAND JURY CHARGES:**

### COUNT ONE
### Racketeering Conspiracy
### 18 U.S.C. § 1962(d)

### I. Introduction

Unless stated otherwise, at all times relevant to this Indictment:

1.    Governance, Incorporated ("Governance") was a government consulting and lobbying S-corporation based in Tallahassee, Florida. Governance was incorporated in the State of Florida on or about May 14, 1999, by defendant **SCOTT CHARLES MADDOX** ("**MADDOX**"). On or about March 12, 2010, **MADDOX** sold Governance to defendant **JANICE PAIGE CARTER-SMITH** ("**CARTER-SMITH**"). In or about April 2010, **CARTER-SMITH** replaced **MADDOX** as Governance's president and registered agent.


FILED USDC FLND TL
DEC 11 '18 PM4:25

2. Governance Services LLC ("Gov. Services") was a government consulting and lobbying limited liability company based in Tallahassee, Florida. Gov. Services was registered with the State of Florida on or about November 21, 2007, listing **CARTER-SMITH** as the sole managing member and registered agent.

3. Although Governance and Gov. Services were two separate legal entities, **MADDOX** and **CARTER-SMITH** operated them and presented them to the public and their clients as a single entity that they and their clients commonly referred to as simply "Governance." **MADDOX** and **CARTER-SMITH** treated Governance and Gov. Services' finances as their own by, among other things, causing payments from the companies' bank accounts to be made directly to their personal bank accounts and moving money to, from, and between the companies' bank accounts to pay for personal, campaign-related, and business expenses.

## II. The Defendants

### A. Defendant MADDOX

4. In or about 1993, **MADDOX** was elected as one of five Tallahassee City Commissioners. In or about 1997, **MADDOX** was elected as the Mayor of Tallahassee, and served in that position until in or about 2003. **MADDOX** was a government consultant and lobbyist beginning no later than in or about 1999, when he created Governance. Between in or about 2003 and in or about November

2

2012, **MADDOX** worked as a lobbyist and ran unsuccessfully for several political offices in Florida.

5.      In 2012, **MADDOX** once again ran for and won a seat on the Tallahassee City Commission.  Prior to the election, **MADDOX** consulted with the then-City Attorney about clearing any conflicts of interest relating to **MADDOX**'s lobbying business.  **MADDOX** stated that he had sold Governance and was in the process of divesting himself of the business.  In fact, **MADDOX** continued to control and profit from Governance and Gov. Services throughout the subsequent six years while he was a City Commissioner.

6.      After being elected City Commissioner, **MADDOX** spoke with the then-City Attorney about **MADDOX**'s conflicts of interest.  **MADDOX** falsely told the City Attorney that he had potential conflicts with several "former" clients. In fact, **MADDOX** had continuing conflicts of interest with Governance and Gov. Services' clients, many of whom did business with or were regulated in some manner by the City of Tallahassee, and some of whom had business that was voted upon by the City Commission.  **MADDOX** concealed these conflicts of interest from the City Attorney, City Staff, City Commission, and the public.

7.      On or about September 17, 2014, **MADDOX** was interviewed under oath by an investigator for the Florida Commission on Ethics.  During this interview, **MADDOX** falsely stated under oath that, "when I decided to qualify for

3

office for the City Commission in 2012, I, I did no, you know, didn't receive any compensation whatsoever from Governance from then until now." When asked by the investigator whether he had "any relationship or, or, or have anything to do with [Gov. Services]," **MADDOX** replied, "I've never had ownership whatsoever of [Gov. Services]." In fact, between November 2012 and the date of that interview, **MADDOX** was, on an ongoing basis, serving as the point of contact at Governance and Gov. Services for multiple clients and receiving financial benefits from Governance and Gov. Services in the forms of, among other things, direct payments and expenses charged to a credit card in **MADDOX**'s name.

8.      In or about April 2015, while still serving as a Commissioner, **MADDOX** declared his candidacy for the Leon County, Florida, Superintendent of Schools, and opened a bank account for his campaign. In or about June 2016, **MADDOX** announced his withdrawal from the Superintendent's race and announced his candidacy for reelection to the City Commission. **MADDOX** was reelected to another four-year term as Commissioner in November 2016. **MADDOX** served continuously as a Commissioner from November 2012 until at least December 2018.

9.      On or about November 30, 2016, **MADDOX** was deposed in a lawsuit involving his residency and eligibility to serve as a Commissioner. After taking an oath to tell the truth, **MADDOX** was asked whether he or his law firm

4

had any business relationship with Gov. Services. **MADDOX** replied, "I'm not sure whether we represented them on anything, I don't know." **MADDOX** was further asked whether he, his family, or his business had any relationship with Governance. **MADDOX** replied, "I don't know what relationship that would be." As **MADDOX** well knew, at that time, he continued to obtain financial benefits from both companies and he served as the point of contact for multiple clients as part of retainer agreements with the companies.

10.     As a Tallahassee City Commissioner, **MADDOX** was an agent of the City of Tallahassee, and he had a fiduciary duty to act in the best interests of Tallahassee and its citizens.

11.     The Community Redevelopment Agency ("CRA") was a joint City of Tallahassee and Leon County entity that was established by the Tallahassee City Commission in 1998. The CRA was comprised of a Board of Directors, whose members included all five Tallahassee City Commissioners, including **MADDOX**. From time to time, the Board of Directors held public meetings and voted on whether to fund redevelopment projects using City and County funds.

12.     As a member of the CRA Board of Directors, **MADDOX** was an agent of the CRA, and he had a fiduciary duty to act in the best interests of Tallahassee and its citizens.

5

## B. Defendant CARTER-SMITH

13.     **CARTER-SMITH** worked with **MADDOX** at Governance

beginning no later than in or about 2003.  **CARTER-SMITH** had previously been

**MADDOX**'s chief of staff when he was the Mayor of Tallahassee.  As stated

above, **CARTER-SMITH** formed Gov. Services in or about 2007.  In 2010,

**CARTER-SMITH** became the owner and registered agent of Governance.  From

that point forward, she managed Governance and Gov. Service's operations,

finances, and client relations with **MADDOX** and at his direction.

14.     During **CARTER-SMITH**'s July 9, 2014, sworn interview with a

Florida Commission on Ethics investigator, she was asked whether **MADDOX** had

"any interest at all in [Governance] from 2010 on?"  **CARTER-SMITH** falsely

replied, "He, he had some involvement with some of the clients but once he filed to

run for office, he was not involved at all."  **CARTER-SMITH** further stated,

falsely, that **MADDOX** was not involved in Gov. Services.

## III.  The Enterprise

15.     Governance and Gov. Services, together with **MADDOX, CARTER-**

**SMITH**, and others known and unknown, constituted an enterprise as defined in

Title 18, United States Code, Section 1961(4), that is, a group of entities and

individuals associated in fact, hereafter referred to as the "Enterprise."

6

16.    The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate commerce.

17.    **MADDOX** and **CARTER-SMITH** controlled and operated the Enterprise.  **MADDOX** was the leader of the Enterprise, and directed other members and associates of the Enterprise in carrying out the unlawful activities and other activities in furtherance of the Enterprise's affairs.  Under the direction of **MADDOX**, defendant **CARTER-SMITH** was a member of the Enterprise and also directed associates of the Enterprise in carrying out the unlawful activities and other activities in furtherance of the Enterprise's affairs.

### IV.  Purposes of the Enterprise

18.    The purposes of the Enterprise included the following, among others:

a.    Enriching the members and associates of the Enterprise through, among other things, bribery, extortion, bank fraud, wire fraud, and mail fraud.  More specifically, a purpose of the Enterprise was to expand and preserve Governance and Gov. Services' client base and increase the companies' revenue.

b.    Advancing the Enterprise's crimes through deception by concealing and protecting the activities of the Enterprise from

7

detection by law enforcement, the public, the City, and others.

      c.     Promoting and enhancing the Enterprise and its members' and associates' activities.

### V. The Racketeering Conspiracy

19.    Between in or about February 2010 and on or about the date of this Indictment, in the Northern District of Florida and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

being persons employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5). The pattern of racketeering activity through which the defendants agreed to conduct the affairs of the Enterprise consisted of multiple acts that are indictable under the following federal statutes:

      a.     Title 18, United States Code, Section 1344(2) (Financial Institution Fraud)

8

b.     Title 18, United States Code, Section 1951 (Interference with

Commerce by Extortion)

c.     Title 18, United States Code, Sections 1343, 1346 (Honest

Services Wire Fraud)

d.     Title 18, United States Code, Sections 1341, 1346 (Honest

Services Mail Fraud)

and multiple acts involving bribery that are chargeable under Florida State Statute

838.015.

20.     It was further part of the conspiracy that each defendant agreed that a

conspirator would commit at least two acts of racketeering activity in the conduct

of the affairs of the Enterprise.

### VI.  Manner and Means

21.     The defendants and their associates agreed to conduct the affairs of

the Enterprise through the following manner and means, among others:

22.     The defendants made false statements, misrepresentations, and

concealed material information from a financial institution and others in order to

obtain economic benefits.

23.     The defendants sent and caused to be sent numerous interstate wire

communications and mailings.

24.     The defendants made false statements, misrepresentations, and concealed material information regarding **MADDOX**'s affiliation with, control, and management of Governance and Gov. Services.

25.     The defendants used **MADDOX**'s official position as a City Commissioner to extort money and solicit bribes from companies with business interests in Tallahassee.  The defendants demanded, sought, and received the money and bribes with the intent that **MADDOX** would be influenced in the performance of official acts, as opportunities arose.

26.     **MADDOX** used his position as City Commissioner to take official action favorable to Governance and Gov. Services clients, including pressuring and advising City officials and voting on measures before the City Commission.

## A.  The Short Sales

27.     Unless stated otherwise, at all times relevant to the short sales described below:

      a.     Branch Banking & Trust Company ("BB&T") was a financial institution, as that term is defined in Title 18, United States Code, Section 20.  BB&T's deposits were federally insured by the Federal Deposit Insurance Corporation.

      b.     BB&T was also a mortgage lending business, as that term is defined in Title 18, United States Code, Section 27, meaning that BB&T

10

financed or refinanced debt secured by an interest in real estate, and its activities affected interstate commerce.

c.     SCM Investments, LLC, ("SCM") was a limited liability company registered with the State of Florida in Tallahassee, Florida. **MADDOX** formed SCM on or about May 6, 2005.

d.     Maddox Acquisitions, LLC, ("MAL") was a limited liability company registered with the State of Florida in Tallahassee, Florida, with Governance as the only member.  **MADDOX** formed MAL on or about March 9, 2007.  **CARTER-SMITH** became the owner of MAL when **MADDOX** transferred Governance to her in March 2010.

e.     Short sale transactions were a means by which financially distressed owners of real estate could sell the real estate to a third party buyer at a price below the amount owed on the outstanding mortgage loan. Short sales had to be approved by the mortgage lender.  Before accepting a short sale, BB&T required the seller to affirm that the transaction was being made at "arms-length," to ensure that the buyer and seller did not have an undisclosed business relationship and that the sale price received reflected the fair market value of the property.  BB&T also required sellers to disclose financial information so that BB&T could accurately assess the seller's ability to make mortgage payments or contribute to the short sale price and

11

to determine whether BB&T could collect from the seller any assets in the event of a judgment.

28.     On or about June 24, 2008, **CARTER-SMITH**, signing as the managing member of Gov. Services, executed a promissory note (the "Condo Loan") for condominium units in the Adams Street Lofts in Tallahassee, Florida. The Condo Loan promised that **CARTER-SMITH** would pay **MADDOX**, another individual, and Spectrum Resources, a company owned by **MADDOX**, $475,000 with 5.5% interest, with full payment due on June 1, 2014.

### i. The 208 West Carolina Avenue Property

29.     At all relevant times, 208 West Carolina Avenue, Tallahassee, Florida, ("208 W. Carolina") was a two-story office building located in Tallahassee.

30.     On or about October 28, 2005, SCM purchased 208 W. Carolina using a commercial loan of $855,000 from BB&T.

31.     On or about October 20, 2010, SCM defaulted on its loan with BB&T for 208 W. Carolina.

32.     On or about February 7, 2011, **MADDOX** submitted to BB&T a letter stating that "in spite of [**MADDOX**'s] best efforts, [208 W. Carolina] has been essentially empty since 2009," and that "there have not been any offers at all in this poor economic climate."

33.    On or about February 7, 2011, in an attachment to the above-described letter to BB&T, **MADDOX** further proposed that the bank accept a short sale of 208 W. Carolina to Gov. Services for the amount of $375,000—nearly $500,000 less than the amount for which **MADDOX** purchased the property through SCM—and included as an attachment to his letter a proposed contract of sale between Gov. Services and SCM.  **CARTER-SMITH** signed the contract on behalf of Gov. Services and **MADDOX** signed the contract on behalf of SCM.  At this time, the outstanding balance on **MADDOX**'s loan was approximately $744,503.

34.    Meanwhile, **MADDOX** told a Governance client that he needed money to fund a short sale.  **MADDOX** obtained from the client a $120,000 check payable to Governance, which was deposited into Gov. Services' bank account on or about August 5, 2011.  **MADDOX** also obtained two checks totaling $95,000 from his family members and caused these checks to be deposited into Gov. Services' bank account to be used by **CARTER-SMITH** as part of the purchase price in the short sale transaction.  Without these checks and the $120,000 deposit, Gov. Services would not have had sufficient funds to purchase 208 W. Carolina.

35.    **MADDOX** submitted a false "Arms-Length Affidavit" to BB&T on or about August 22, 2011.  The affidavit falsely stated that the "sale is an arms-length transaction between Buyer and Seller, and said Buyer, including its

13

principals, directors, and officers, is not an agent, representative, owner, or employee of Seller."

36.     On or about August 22, 2011, **MADDOX** submitted a Full and Final Settlement Agreement to BB&T, signed by **MADDOX**, falsely stating that the buyer was an "unrelated party" to SCM.

37.     Based on the information **MADDOX** submitted, BB&T agreed to the short sale of 208 W. Carolina to Gov. Services for approximately $465,000 from Gov. Services and a promissory note of approximately $150,000 from SCM to BB&T. BB&T forgave approximately $129,503 of SCM's debt in the transaction, not including the promissory note. **MADDOX** paid only approximately $30,000 on the SCM promissory note before defaulting.

### ii. The 510 North Adams St. Property

38.     510 North Adams Street, Tallahassee, Florida ("510 N. Adams") was a house located in downtown Tallahassee that was, at times, used in part as an office building.

39.     On or about March 15, 2007, MAL purchased 510 N. Adams for $550,000, using a commercial loan of $495,000 from BB&T. To secure this mortgage loan through MAL, Governance and **MADDOX**, personally, guaranteed the loan.

14

40.    On or about March 15, 2007, in order to secure the 510 N. Adams
loan from BB&T, **MADDOX** submitted to BB&T a Declaration of Limited
Liability Company or Limited Liability Partnership and Authority to Borrow.  This
document, which **MADDOX** signed as the president of Governance, stated that
**MADDOX** would "promptly notify [BB&T] if any other person, or legal entity
acquires an ownership interest in [MAL]."  **MADDOX** never notified BB&T that,
in or about March 2010, he sold Governance, which wholly owned MAL, to
**CARTER-SMITH**.

41.    On or about March 15, 2012, MAL and **MADDOX** defaulted on the
BB&T loan for 510 N. Adams.

42.    In or about March 2012, **MADDOX** informed BB&T that he wished
to engage in a short sale for the 510 N. Adams property.  **MADDOX** stated that he
had an offer from a buyer, Gov. Services, for $225,000—over $250,000 less than
the amount for which **MADDOX** purchased the property—and **MADDOX** would
supplement this offer with $75,000 cash.  BB&T preliminarily accepted the sale
price and negotiated a cash supplement from **MADDOX** of $100,000, subject to
the submission of the below-described documents and their accompanying
affirmations.  BB&T forgave approximately $133,448, the remaining amount of
debt on the mortgage loan, by accepting the short sale.

15

43.     On or about August 28, 2012, in support of his request to BB&T for a short sale of 510 N. Adams, **MADDOX** submitted a Personal Financial Statement to BB&T that claimed that he had no significant assets beyond 510 N. Adams and his personal residence.  In doing so, **MADDOX** concealed from BB&T, among other assets, (1) $34,000 in his personal bank account, (2) real property in Madison County, Florida, (3) the balance and interest due to him from the Condo Loan as an asset, and (4) approximately eight vehicles that **MADDOX** owned.

44.     In or about December 2012, **MADDOX** submitted to BB&T documents falsely stating that he was the "president" of Governance at the time of the sale.

45.     On or about December 14, 2012, **MADDOX** submitted to BB&T a Arms-Length Affidavit, which he signed on or about December 14, 2012.  The affidavit falsely stated that the "sale is an arms-length transaction between Buyer and Seller."  The affidavit further falsely stated that, "said Buyer, including its principals, directors, and officers, is not an agent, representative, owner, or employee of Seller."

46.     On or about December 14, 2012, **MADDOX** submitted to BB&T a "Full and Final Settlement Agreement" falsely stating that "Borrower currently own[ed] the Property and desire[d] to sell it, but ha[d] been unable, despite Borrower's best efforts, to enter into a contract to sell [510 N. Adams] for a price

16

sufficient to generate net sale proceeds to fully pay the remaining indebtedness due on the loan."

47.     This Full and Final Settlement Agreement also falsely stated that the buyer, Gov. Services, was an "unrelated party" to MAL.

48.     On or about December 13, 2012, in order to satisfy his obligation to pay $100,000 to BB&T under the terms of the short sale, **MADDOX** caused $100,000 to be wired from Gov. Services' bank account into **MADDOX**'s personal bank account.  To conceal that he had received the money from Gov. Services, **MADDOX** then purchased a cashier's check in the amount of $100,000 payable to Governance and deposited the cashier's check into the Governance bank account.  **MADDOX** then purchased a $100,000 cashier's check payable from the Governance bank account to the closing agent for the short sale.

## B.  The Clients

### i.  Company A

49.     At all relevant times, Company A was an architectural engineering firm that did, or sought to do, business in the Tallahassee area, including with the City of Tallahassee and Leon County.  Company A was on, or sought to be on, a City Commission-approved bidders list for City contracts.  Once a company was voted onto the approved bidders list, City officials had the discretion to hire the company for City-funded projects, and to negotiate with the company on issues

17

that arose relating to such projects. Engineering firms such as Company A that did business in and with the City of Tallahassee were also subject to various permitting and licensing approvals that were left to the discretion of City officials.

50. In or about 2007, Company A hired Governance as its government consultant, and began paying Governance a monthly retainer fee for **MADDOX**'s consulting and lobbying services. Company A stopped making these payments in May 2011.

51. In or about May 2012, during a meeting with Company A executives, **MADDOX** stated that he would make sure that an individual who had supported **MADDOX**'s opponent in a previous political campaign, and who owned an architectural engineering firm that was Company A's competitor, would never again do business in the City of Tallahassee. At the time, **MADDOX** was running for City Commissioner. **MADDOX** made this statement with the intent to place Company A in fear of economic harm to induce Company A to pay **MADDOX**.

52. During the meeting, a Company A employee asked **MADDOX** how Company A could help with **MADDOX**'s political campaign. **MADDOX** replied that Company A could catch up on its payments to Governance.

53. Thereafter, beginning on or about May 10, 2012, based on their fear of economic harm, Company A paid Governance a monthly retainer fee ranging from approximately $2,000 to $5,000. Once **MADDOX** was elected in November

18

2012, Company A continued to pay Governance a monthly retainer fee until on or about October 27, 2015, when Company A stopped paying Governance.  Between on or about May 10, 2012, and on or about October 27, 2015, **MADDOX** held himself out to Company A as Company A's government consultant and lobbyist.

54.    After **MADDOX** was elected to the City Commission, and during the course of Company A's payments to **MADDOX**, he did not disclose to the City Attorney or the City Commission that he represented Company A.  Nor did **MADDOX** disclose to the City Attorney or the City Commission that Company A was paying Governance and/or Gov. Services, and that **MADDOX** was receiving payments from both entities.

55.    On or about November 26, 2013, the City Commission voted on whether to authorize City officials to negotiate and execute with a list of ten firms, including Company A, contract extensions for water resources engineering. **MADDOX** voted in favor.

56.    On or about August 19, 2015, the City Commission voted on whether to authorize City officials to negotiate and execute with a list of ten firms, including Company A, contract extensions for water resources engineering. **MADDOX** voted in favor.

57.    From time to time, Company A would miss its monthly payments to Gov. Services, and **MADDOX** would contact a representative of Company A and

19

state, "show me some love," which meant that Company A should catch up on monthly payments. However, during this time, **MADDOX** did not provide to Company A any services in the form of lobbying, consulting, or otherwise, besides introducing Company A to the owner of Company E, which was also paying Gov. Services a monthly retainer fee at the time.

58.     Between in or about May 2012 and on or about October 27, 2015, Company A paid Governance and Gov. Services approximately $61,500.

### ii. Company B

59.     At all relevant times, Company B was a rideshare company that operated across the United States.

60.     In 2015, the City Commission was considering making amendments to a local ordinance that would affect Company B's ability to profitably operate in Tallahassee, and the amendments were set to be voted upon by the Commissioners.

61.     On or about March 2, 2015, Person A, who was a government relations professional employed by Company B, met with **MADDOX** to discuss the rideshare ordinance. **MADDOX** was non-committal and stated that he was being lobbied by Company B's opponent on the ordinance, namely, the taxi industry. **MADDOX** further stated that **CARTER-SMITH** could help Company B obtain a favorable result on the ordinance.

20

62.     Thereafter, with **MADDOX**'s knowledge and at **MADDOX**'s direction **CARTER-SMITH** met with Person A, and solicited payments from Company B, in exchange for **MADDOX**'s vote on the ordinance and related issues.

63.     On or about March 25, 2015, **CARTER-SMITH** procured Company B's agreement to pay Governance a $5,000 monthly retainer for her "consulting" services.

64.     After securing Company B's agreement to pay Governance, **CARTER-SMITH** served as a go-between for communications between Company B representatives and **MADDOX**.

65.     On or about March 25, 2015, the City Commission met to vote on whether to delay passage of an amended ordinance that would have made it difficult for Company B to operate profitably in Tallahassee.  A related issue discussed at the meeting was whether the pre-existing ordinance would be enforced against Company B's drivers.  Such enforcement would have potentially subjected Company B's drivers to criminal and/or civil liability.

66.     Shortly before the meeting, **CARTER-SMITH** sent Person A a text message stating, in part, "Comm Maddox will make the motion [to delay a vote on the ordinance]."  **MADDOX** then moved to delay the vote and the Commissioners voted unanimously for the delay.  On the dais, **MADDOX** stated that he had a long

21

history of supporting the taxi cab industry and that the existing ordinance should be enforced.  Shortly after the meeting, **CARTER-SMITH** sent Person A three consecutive text messages stating, "A message," "Don't worry about enforcement," and "We'll discuss."

67.    On July 8, 2015, the City Commission again met to discuss amendments to the rideshare ordinance.  Prior to the meeting, **CARTER-SMITH** texted Company B representatives, stating, "Maddox is going to be at the important part of the meeting :-) . . . . I did not want you to panic when you did not see him there."  During this meeting, **CARTER-SMITH** told Company B representatives by text message that she was passing their messages onto **MADDOX**, and asked questions to Company B representatives that purportedly came from **MADDOX**.  For instance, **CARTER-SMITH** texted a Company B representative asking whether they were "ok with removing insurance requirement."  After receiving an affirmative response, **CARTER-SMITH** replied, "Ok.  He said up to u."

68.    At this July 8 meeting, **MADDOX** took several votes to make amendments to the ordinance and a final vote to adopt the new ordinance as amended.  All of the requests that Company B made to **CARTER-SMITH** and **MADDOX** were incorporated into the resulting ordinance.

22

69.     Between on or about May 7, 2015, and on or about October 15, 2015, Company B paid Governance $30,000.  During the same time period, Governance and Gov. Services made approximately $40,000 in payments to **MADDOX** directly.

### iii.  Company C

70.     At all relevant times, Company C was a waste services provider.  On or about March 20, 2006, Company C entered into a contract with Governance by which Governance would serve as Company C's "Marketing and Planning Consultant."  Company C's agreement with Governance permitted Company C to call upon **MADDOX** and **CARTER-SMITH** for their assistance in working with City officials and government officials in Florida on an as-needed basis.  In exchange, Company C paid Governance a $4,000 monthly retainer.  On or about September 8, 2006, the City of Tallahassee entered into a seven-year contract with Company C for waste management services.

71.     In or about September 2012, the City Commission voted to extend Company C's contract for five years such that the contract would be up for renewal and would require another City Commission vote in September 2018.

72.     Beginning no later than in or about November 2012, Person B was a regional vice president at Company C serving the Tallahassee area.

73.     After **MADDOX** was elected to the City Commission, and during the course of Company C's payments to Governance, he did not disclose to the City Attorney or the City Commission that he managed the operations and finances of Governance and Gov. Services.  In fact, **MADDOX** falsely characterized Company C to the City Attorney as a "former" client.  Nor did **MADDOX** disclose to the City Attorney or the City Commission that Company C was paying Governance and/or Gov. Services, and that **MADDOX** was receiving payments from both entities.  After being elected to the City Commission, **MADDOX**, implicitly and explicitly, continued to solicit and accept payments from Company C in exchange for **MADDOX**'s agreement to engage in official acts to benefit Company C as opportunities arose.

74.     In or about December 2013, **MADDOX** proposed a new contract between Gov. Services and Company C which was entered into in or about January 2014.  This contract increased Company C's monthly retainer fee to Gov. Services to $4,500, and listed Gov. Services as Company C's "marketing and government consultant in Tallahassee, Florida."

75.     In or about July 2014, Tallahassee fined Company C approximately $64,000 for failing to deliver trash receptacles for City residents.  Person B made multiple unsuccessful attempts to appeal directly to City employees to reduce the fine.  Person B then called **MADDOX**, and asked **MADDOX** to intercede with the

24

City employees to get the fine reduced. **MADDOX** indicated to Person B that he would resolve the issue. **MADDOX** spoke with the City Manager, and the fine was ultimately reduced to approximately $7,000.

76.     Before and after the fine was reduced, **CARTER-SMITH** e-mailed three written updates to Company C stating that Governance was working on and succeeded in reducing the fine.

77.     Between in or about November 2012 and in or about April 2017, Company C paid Governance and Gov. Services approximately $190,000.

### iv. Company D

78.     At all relevant times Company D was a construction company operating primarily in and nearby the City of Tallahassee.

79.     Beginning in or about 2005, Company D's owner, Person C, negotiated a contract with **MADDOX** for Governance to be Company D's lobbyist. In or about 2005, Company D began paying Governance a monthly retainer fee of $6,500. In or about 2010, Company D reduced the monthly payments to Governance to $2,500.

80.     When **MADDOX** was elected to the City Commission in November 2012, Company D continued to make these payments to Governance. **MADDOX**, implicitly and explicitly, continued to solicit and accept these payments from

Company D in exchange for **MADDOX**'s agreement to engage in official acts to benefit Company D as opportunities arose.

81.     On or about January 22, 2014, **MADDOX** voted against amendments to a City administrative policy that **MADDOX** knew posed economic challenges to Company D.  Prior to the vote, **MADDOX** sent a text message to Company D's owner asking whether he had any suggested changes for the policy.  Before casting his vote and while on the dais, **MADDOX** questioned the policy's constitutionality.

82.     On or about November 24, 2015, the City Commission voted on whether to approve three-year contract extensions with nine firms, including Company D, which had been prequalified to perform sidewalk construction and rehabilitation services.  **MADDOX** made the initial motion for approval and voted affirmatively to approve.

83.     In or about December 2015, Company D was in a dispute with City officials concerning a Company D construction project contracted by the City. After failing to resolve the dispute in direct communications with City officials, Company D representatives met with **MADDOX** to request that **MADDOX** intervene to resolve the dispute in a manner favorable to Company D.  **MADDOX** agreed to do so.

84.    On or about December 14, 2016, **MADDOX** voted to approve an extension of a City Contract with Company D.  That evening, after the vote, Person C sent **MADDOX** a text message stating, "You do good work."  Minutes later, **MADDOX** replied, "I love it when a plan comes together!"

85.    In considering and voting on these matters, **MADDOX** failed to disclose to the City Attorney and City Commission that Gov. Services was being paid by Company D, that **MADDOX** had an ongoing financial interest in Gov. Services, or that **MADDOX** had an ongoing retainer agreement with Company D.

86.    Between in or about November 2012 and in or about October 2017, Company D paid Governance and Gov. Services approximately $146,000.

### v.  Company E

87.    At all relevant times, Company E was a residential development company.  Person D was an owner of Company E.

88.    In or about 2003, Company E began paying Governance a monthly $2,500 retainer for lobbying work in and around Tallahassee.  In or about 2007, Company E increased its monthly payments to $7,000.

89.    In or about November 2012, shortly before or after being elected to the City Commission, **MADDOX** told Person D that Company E's monthly payments should be sent to Gov. Services rather than Governance.  After he was elected, **MADDOX**, implicitly and explicitly, continued to solicit and accept

payments from Company E in exchange for **MADDOX**'s agreement to engage in official acts to benefit Company E as opportunities arose.

90.     In or about March 2017, Person D met with **MADDOX** and **CARTER-SMITH**.  During the meeting, Person D stated that he would soon be needing additional assistance from **MADDOX** in Company E's dealings with City officials.  **MADDOX** and Person D agreed that Company E would make a one-time payment to Gov. Services of $10,000 followed by six monthly payments of $5,000.

91.     Shortly thereafter, Person D contacted **MADDOX** about the City's refusal to approve a certain type of fencing in one of Company E's residential developments.  Person D asked **MADDOX** to intervene with the City officials so that the staff would change its decision on the fence.  **MADDOX** agreed to do this. **MADDOX** then contacted the City Manager.

92.     Several days later, a City official e-mailed Person D to inform him that the City had changed its position on the fence.  On March 13, 2016, Person D forwarded this e-mail to **MADDOX**.  **MADDOX** replied, by e-mail, "I love it when a plan comes together."

93.     In or about January 2017, Company E was facing an issue concerning the City of Tallahassee Utilities Department's work at one of Company E's apartment complexes.  On or about January 25, 2017, Person D sent **MADDOX** a

text message regarding the issue.  Less than two hours later, **MADDOX** responded, by text message, "All good.  I can handle city guy no prob.  Already had a word at the top.  Should be straightened out."

94.     Between in or about November 2012 and in or about March 2017, Company E and its affiliates paid Gov. Services approximately $138,000.

### vi. Person E

95.     In or about January and February 2016, the CRA was considering granting funds in the form of tax incentives for a development project in Tallahassee.

96.     Person E was a local developer and one of the applicants for the funding.

97.     Person F was a local business owner and associate of **MADDOX**.

98.     In or about February 2016, Person F, at **MADDOX**'s direction, told Person E that Person E should pay Governance and/or a Governance employee as a consultant in exchange for **MADDOX**'s vote on the project.  Person F indicated to Person E that this was a message coming from **MADDOX**.

99.     Person E refused to pay Governance or hire any of its employees as a consultant or otherwise.

100.   On or about February 27, 2014, the CRA voted to fund the project for approximately $1.6 million.  **MADDOX** did not attend the CRA meeting in which the project was funded.

### vii.  Company F

101.   Between in or about July 2016 and on or about May 24, 2017, Company F served as a front for undercover Federal Bureau of Investigation agents who were investigating allegations of criminal activity in Tallahassee.  The agents posed as representatives of Company F who were real estate and medical marijuana entrepreneurs.  Among the projects Company F was pursuing were real estate developments in the Tallahassee area.  Each project required or would benefit from the Tallahassee City Commission taking official action, such as rezoning property or annexing certain property into the City's limits.  The CRA could also provide grant funding for the projects.

102.   At all relevant times, Person G was a local real estate developer and entrepreneur.

103.   On or about July 21, 2016, Person G spoke to a Company F representative about a potential real estate deal in the Tallahassee area and identified **MADDOX** as the most powerful member of the CRA.

104.   On or about September 21, 2016, Person G met with a Company F representative and other individuals.  During this meeting, Person G agreed to

30

secure **MADDOX**'s support for a potential project by Company F in exchange for Company F paying Person G a percentage of the deal. Person G said that Maddox would be able to support the project by committing official acts such as convincing other Commissioners to support the project. Person G stated that **MADDOX** "effectively gets paid through the lobbying firm." Person G stated that the amount that Company F would need to pay **MADDOX** through the lobbying firm would increase based on the political difficulty of authorizing the project. Person G gave the example that Company F may need to pay **MADDOX**'s lobbying firm $10,000 per month for perhaps as long as three years if the value of the benefit to be obtained by Company F from a Tallahassee-area governmental agency was $3 million.

105.   On or about October 1, 2016, a Company F representative met with **MADDOX**. Another individual present stated that the Company F representative was seeking to do several real estate deals in Tallahassee. The Company F representative then told **MADDOX** that Person G recommended that he meet **MADDOX**. **MADDOX** responded, "[Person G] is my guy."

106.   On or about October 4, 2016, a Company F representative met with **MADDOX** in Tallahassee. During the conversation, the representative asked, "So can we hire you as, like, a consultant? Like you have a business, right?" **MADDOX** replied, "Not me. I can tell you somebody that you can hire. But not

31

me." The representative asked if he could pay **MADDOX**'s law firm to consult on the project. **MADDOX** replied, "You wouldn't want to do that. You wanna pay the consulting firm that I told you, so that I would not be conflicted out . . . You'd wanna hire Governance Incorporated." The representative then asked, "[Person G] will tell me that, right?" **MADDOX** replied, "[Person G] will tell you who it is." Later on in the conversation, the representative asked, "What would I need to pay you, uh, not you, but your, what would I need to put in the coffers a month to start the ball rolling?" **MADDOX** replied, "Twenty." The representative asked, "Twenty a month?" **MADDOX** replied, "Yeah." The representative said to **MADDOX**, "That's a lot of money." **MADDOX** replied, "No it's not."

107. On or about October 19, 2016, Person G and a Company F representative agreed that Company F would pay **MADDOX** $10,000 per month, and that Person G would follow up with further logistics as to how to make the payments.

108. On or about October 24, 2016, Person G confirmed that the payments should go to Governance and that such payments were "definitely for **MADDOX** . . . , there's nobody else in Governance other than Paige, which is **MADDOX**, effectively." Person G said that **MADDOX** wanted "to keep his conversations narrowed to one person." Person G further advised with regard to getting payments to **MADDOX**, "Governance is the answer," and that Person G

would have a discussion with **MADDOX** about how **MADDOX** wished to "receive those funds . . . into Governance."

109.   On or about October 29, 2016, Person G told a Company F representative that **MADDOX** wanted to deal only with Person G, because **MADDOX** did not "want any more friends" and did not want to have "inappropriate conversations" with anyone but Person G.

110.   On or about October 29, 2016, **MADDOX** met with a Company F representative and confirmed that Company F's $10,000 payment should be made to Governance; in exchange, **MADDOX**, implicitly and explicitly, agreed to perform official acts to benefit Company F.  **MADDOX** further advised that **CARTER-SMITH** was on board with how and why these payments were being made to Governance and that **MADDOX** had no secrets from **CARTER-SMITH**. **MADDOX** reiterated that if Person G was on board, **MADDOX** was on board.

111.   On or about November 16, 2016, Company F mailed a check via U.S. Postal Service for $10,000 to Governance, and on or about January 23, 2017, Company F mailed a check via U.S. Postal Service to Gov. Services for $10,000.

112.   On or about December 18, 2016, and on or about February 22, 2017, Company F sent checks for $10,000 each to Gov. Services via the United Parcel Service.

113.   On or about December 16, 2016, **CARTER-SMITH** sent Company F a "Consulting Agreement."  The agreement stipulated that Gov. Services would provide "marketing" and "government consulting services" to Company F for $10,000 per month for twelve months.

114.   In or about December 2016, **MADDOX** traveled to and from Las Vegas, Nevada, with Company F representatives.  **MADDOX** accepted a flight to Las Vegas on a chartered jet from Company F.  **MADDOX** also accepted a hotel room and meal expenses paid by Company F representatives.  During this trip, **MADDOX** told an anecdote about threatening to destroy a former client's business deals if the former client did not pay **MADDOX** his fee.

115.   Following the issuance of Federal Grand Jury subpoenas to the City of Tallahassee in or about May 2017, **MADDOX** and **CARTER-SMITH** caused to be purchased cell phones, which were not registered to a specific person, to be used for communications between **MADDOX**, **CARTER-SMITH**, and others, including a City of Tallahassee staff member.

116.   On or about May 24, 2017, **MADDOX** and **CARTER-SMITH** were interviewed by federal law enforcement agents about their interactions and business relationships with Company F and its representatives.  **MADDOX** falsely stated to the agents that Company F representatives had not attempted to pay him any money, that **MADDOX** was not involved in Company F's introduction to

34

**CARTER-SMITH**, and that **MADDOX** had no relationship with Governance.

**CARTER-SMITH** falsely stated that she was the only person associated with

Governance.

All in violation of Title 18, United States Code, Section 1962(d).

### COUNT TWO
### Bank Fraud – 208 W. Carolina
### 18 U.S.C. §§ 1344(2) and 2

### I. Introduction

1.     Paragraphs 1 through 14, 24, and 27 through 28 of Count One are

realleged and incorporated by reference as if fully set forth herein.

### II. The Charge

2.     Between on or about February 7, 2011, and on or about August 22,

2011, in the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and
### JANICE PAIGE CARTER-SMITH,

did knowingly execute and attempt to execute a scheme to obtain money, funds,

credits, assets, and other property owned by, and under the custody and control of,

BB&T, by means of materially false and fraudulent pretenses, representations, and

promises.

### III.  The Fraudulent Scheme

3.      The fraudulent scheme is summarized in paragraphs 22 and 29

through 37 of Count One, which are realleged and incorporated by reference as if

fully set forth herein.

### IV.  Execution of the Scheme

4.      On or about August 22, 2011, for the purpose of executing and

attempting to execute this fraudulent scheme, **MADDOX** and **CARTER-SMITH**,

did knowingly submit and cause to be submitted false documents, including a  Full

and Final Settlement Agreement and an Arm's Length Affidavit, to BB&T to

obtain, in support of, and in the closing of, the short sale of 208 W. Carolina.

In violation of Title 18, United States Code, Sections 1344(2) and 2.

### COUNT THREE
### Bank Fraud – 510 N. Adams
### 18 U.S.C. §§ 1344(2) and 2

### I. Introduction

1.      Paragraphs 1 through 14, 24, and 27 through 28 of Count One are

realleged and incorporated by reference as if fully set forth herein.

### II.  The Charge

2.      Between in or about March 2012 and on or about December 14, 2012,

in the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX

36

**and**
**JANICE PAIGE CARTER-SMITH,**

did knowingly execute and attempt to execute a scheme to obtain money, funds, credits, assets, and other property owned by, and under the custody and control of, BB&T, by means of materially false and fraudulent pretenses, representations, and promises.

### III.  The Fraudulent Scheme

3.      The fraudulent scheme is summarized in paragraphs 22 and 38 through 48 of Count One, which are realleged and incorporated by reference as if fully set forth herein.

### IV.  Execution of the Scheme

4.      Between in or about August 2012 and on or about December 14, 2012, for the purpose of executing and attempting to execute this fraudulent scheme, the defendants, **MADDOX** and **CARTER-SMITH**, did knowingly submit and cause to be submitted to BB&T false documents, including a Personal Financial Statement, a Full and Final Settlement Agreement, an Arms-Length Affidavit, a Joinder and Consent, and an Affidavit of Company Status to obtain, in support of, and in the closing of, the short sale of 510 N. Adams.

In violation of Title 18, United States Code, Sections 1344(2) and 2.

### COUNT FOUR
### False Statements to a Financial Institution – 208 W. Carolina

**18 U.S.C. § 1014**

1.      Paragraphs 1 through 14, 22, 24, and 27 through 37 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      On or about August 22, 2011, in the Northern District of Florida and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

did knowingly make a false statement and report for the purpose of influencing the action of BB&T, upon an application, purchase, and loan; namely, the defendant knowingly submitted a Full and Final Settlement Agreement falsely stating that Gov. Services was an "unrelated party" to SCM when, in fact, the parties were related in that **MADDOX** controlled both entities and had in fact himself obtained a large portion of the money paid by Gov. Services for the short sale.

In violation of Title 18, United States Code, Section 1014.

### COUNT FIVE
### False Statements to a Financial Institution – 510 N. Adams
### 18 U.S.C. § 1014

1.      Paragraphs 1 through 14, 22, 24, 27 through 28, and 38 through 48 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      On or about December 14, 2012, in the Northern District of Florida and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

38

did knowingly make a false statement and report for the purpose of influencing the action of BB&T, upon an application, purchase, and loan; namely, the defendant knowingly submitted a Full and Final Settlement Agreement falsely stating that he was the president of Governance when in fact, as **MADDOX** well knew, **CARTER-SMITH** was the president of Governance.

In violation of Title 18, United States Code, Section 1014.

**COUNT SIX**
**False Statements to a Financial Institution – 510 N. Adams**
**18 U.S.C. § 1014**

1.      Paragraphs 1 through 14, 22, 24, 27 through 28, and 38 through 48 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      On or about December 14, 2012, in the Northern District of Florida and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

did knowingly make a false statement and report for the purpose of influencing the action of BB&T, upon an application, purchase, or loan; namely, the defendant knowingly submitted a Joinder and Consent, in which **MADDOX** falsely represented that he was the president of Governance, when in fact **CARTER-SMITH** was the president of Governance.

In violation of Title 18, United States Code, Section 1014.

**COUNT SEVEN**

39

## False Statements to a Financial Institution – 510 N. Adams
## 18 U.S.C. § 1014

1.      Paragraphs 1 through 14, 22, 24, 27 through 28, and 38 through 48 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      On or about December 14, 2012, in the Northern District of Florida and elsewhere, the defendant,

### SCOTT CHARLES MADDOX,

did knowingly make a false statement and report for the purpose of influencing the action of BB&T, upon an application, purchase, or loan; namely, the defendant knowingly submitted a Full and Final Settlement Agreement falsely stating that he currently owned 510 N. Adams, when in fact **MADDOX** had no legal ownership of that property at the time.

In violation of Title 18, United States Code, Section 1014.

## COUNT EIGHT
## Extortion Using Fear of Economic Harm – Company A
## 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 49 through 58 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      Between in or about May 2012 and on or about October 27, 2015, in the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and

40

**JANICE PAIGE CARTER-SMITH,**

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

that is, the defendants obtained the property of Company A with Company A's

consent induced by the wrongful use of fear of economic loss.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT NINE
### Extortion Under Color of Official Right – Company B
### 18 U.S.C. §§ 1951 and 2

1.     Paragraphs 1 through 14, 21 through 26, and 59 through 69 of Count

One are realleged and incorporated by reference as if fully set forth herein.

2.     Between on or about March 2, 2015, and in or about October 2015, in

the Northern District of Florida, and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce, by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

41

that is, the defendants obtained property not due **MADDOX** or his office as a City

Commissioner, from Company B, with Company B's consent, under color of

official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT TEN
### Extortion Under Color of Official Right – Company C
### 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 70 through 77 of Count

One are realleged and incorporated by reference as if fully set forth herein.

2.      Between in or about November 2012 and in or about April 2017, in

the Northern District of Florida, and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce, by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

that is, the defendants obtained property not due **MADDOX** or his office as a City

Commissioner, from Company C, with Company C's consent, under color of

official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT ELEVEN
### Extortion Under Color of Official Right – Company D
### 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 78 through 86 of Count

One are realleged and incorporated by reference as if fully set forth herein.

2.      Between in or about November 2012 and in or about October 2017, in

the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and
### JANICE PAIGE CARTER-SMITH,

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce, by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

that is, the defendants obtained property not due **MADDOX** or his office as a City

Commissioner, from Company D, with Company D's consent, under color of

official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

43

## COUNT TWELVE
### Extortion Under Color of Official Right – Company E
### 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 87 through 94 of Count

One are realleged and incorporated by reference as if fully set forth herein.

2.      Between in or about November 2012 and in or about October 2017, in

the Northern District of Florida, and elsewhere, the defendants,

## SCOTT CHARLES MADDOX
### and
## JANICE PAIGE CARTER-SMITH,

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce, by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

that is, the defendants obtained property not due **MADDOX** or his office as a City

Commissioner, from Company E, with Company E's consent, under color of

official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT THIRTEEN
### Extortion Under Color of Official Right– Person E
### 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 95 through 100 of Count

One are realleged and incorporated by reference as if fully set forth herein.

44

2.      In or about February 2014, in the Northern District of Florida, and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

did knowingly obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, and did attempt to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, **MADDOX** attempted to obtain property not due **MADDOX** or his office as a City Commissioner, from Person E and Person E's client, with Person E's consent, under color of official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT FOURTEEN
### Extortion Under Color of Official Right – Company F
### 18 U.S.C. §§ 1951 and 2

1.      Paragraphs 1 through 14, 21 through 26, and 101 through 116 of Count One are realleged and incorporated by reference as if fully set forth herein.

2.      Between in or about October 2016 and in or about February 2017, in the Northern District of Florida, and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

45

did knowingly obstruct, delay, and affect commerce and the movement of articles

and commodities in commerce, and did attempt to obstruct, delay, and affect

commerce and the movement of articles and commodities in commerce, by

extortion, as those terms are defined in Title 18, United States Code, Section 1951;

that is, the defendants attempted to obtain and did obtain property not due

**MADDOX** or his office as a City Commissioner, from Company F, with the

consent of Company F's representatives, under color of official right.

In violation of Title 18, United States Code, Sections 1951 and 2.

### COUNTS FIFTEEN THROUGH TWENTY-TWO
### Honest Services Wire Fraud – Companies B, C, D, E, and F
### 18 U.S.C. §§ 1343, 1346, and 2

### I. Introduction

1.     Paragraphs 1 through 14 of Count One are realleged and incorporated

by reference as if fully set forth herein.

### II. The Charge

2.     Between in or about November 2012 and in or about October 2017, in

the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and
### JANICE PAIGE CARTER-SMITH,

46

did knowingly and willfully devise and intend to devise a scheme to defraud and deprive the City of Tallahassee and its citizens of their right to the honest services of **MADDOX**, a Tallahassee City Commissioner, through bribery.

### III.  The Fraudulent Scheme

3.      The fraudulent scheme is summarized in paragraphs 21 through 26, 59 through 94, and 101 through 116 of Count One, which are realleged and incorporated by reference as if fully set forth herein.

### IV.  Wire Communications

4.      On or about the following dates, in the Northern District of Florida, and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

for the purpose of executing the fraudulent scheme, caused wire communications to be transmitted in interstate commerce as set forth below.

| COUNT | DATE | WIRE TRANSMISSION |
|---|---|---|
| FIFTEEN | January 14, 2014 | E-mail from **MADDOX** to **CARTER-SMITH** and representatives of Company C |
| SIXTEEN | February 10, 2014 | E-mail from **MADDOX** to representative of Company C and **CARTER-SMITH** |
| SEVENTEEN | December 19, 2014 | E-mail from representative of Company A to **MADDOX** re: Company E |

47

| EIGHTEEN | February 26, 2015 | E-mail from Person D to **CARTER-SMITH** |
| NINETEEN | March 17, 2015 | E-mail from **CARTER-SMITH** to Person A |
| TWENTY | June 9, 2015 | E-mail from Company B representative to **CARTER-SMITH** |
| TWENTY-ONE | March 13, 2017 | E-mail from Person D to **MADDOX** and **CARTER-SMITH** |
| TWENTY-TWO | May 22, 2017 | E-mail from Person D to **CARTER-SMITH** and **MADDOX** |

In violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNTS TWENTY-THREE THROUGH TWENTY-SIX
### Honest Services Mail Fraud – Company F
### 18 U.S.C. §§ 1341, 1346, and 2

### I.  Introduction

1.      Paragraphs 1 through 14 of Count One are realleged and incorporated by reference as if fully set forth herein.

### II.  The Charge

2.      Between in or about July 2016 and in or about July 2017, in the Northern District of Florida, and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and
### JANICE PAIGE CARTER-SMITH,

did knowingly and willfully devise and intend to devise a scheme to defraud and deprive the City of Tallahassee and its citizens of their right to the honest services of **MADDOX**, a Tallahassee City Commissioner, through bribery.

48

### III.  The Fraudulent Scheme

3.      The fraudulent scheme is summarized in paragraphs 21 through 26,

and 101 through 116 of Count One, which are realleged and incorporated by

reference as if fully set forth herein.

### IV. Mailings

4.      On or about the following dates, in the Northern District of Florida,

and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

for the purpose of executing the fraudulent scheme and attempting to do so, caused

to be transmitted by United States mail and private and commercial carrier the

following matter:

| COUNT | DATE | MAILING |
|---|---|---|
| TWENTY-THREE | November 16, 2016 | $10,000 check sent through the U.S. Postal Service. |
| TWENTY-FOUR | December 18, 2016 | $10,000 check sent through the United Parcel Service. |
| TWENTY-FIVE | January 23, 2017 | $10,000 check sent through the U.S. Postal Service. |
| TWENTY-SIX | February 22, 2017 | $10,000 check sent through the United Parcel Service. |

In violation of Title 18, United States Code, Sections 1341, 1346, and 2.

49

## COUNTS TWENTY-SEVEN THROUGH THIRTY-FIVE
### 18 U.S.C. §§ 1952(a)(3) and 2
### Travel Act

1.      Counts 1 through 14, 21 through 26, and 59 through 94 are realleged and incorporated as if fully set forth herein.

2.      On or about the dates set forth below, in the Northern District of Florida and elsewhere, the defendants,

### SCOTT CHARLES MADDOX
### and
### JANICE PAIGE CARTER-SMITH,

knowingly and willfully did use, and cause to be used, a facility in interstate and foreign commerce with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely bribery, contrary to Florida Statute Section 838.015, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

| COUNT | DATE | FACILITY | DESCRIPTION |
|---|---|---|---|
| TWENTY-SEVEN | January 14, 2014 | Internet | E-mail from **MADDOX** to **CARTER-SMITH** and representatives of Company C |
| TWENTY-EIGHT | February 10, 2014 | Internet | E-mail from **MADDOX** to |

50

| | | | representative of Company C and **CARTER-SMITH** |
|---|---|---|---|
| TWENTY-NINE | March 25, 2015 | Cell Phone | Text message from **CARTER-SMITH** to Person A |
| THIRTY | July 8, 2015 | Cell Phone | Text message from **CARTER-SMITH** to Person A |
| THIRTY-ONE | October 16, 2015 | Cell Phone | Text message from **MADDOX** to Person D |
| THIRTY-TWO | March 4, 2016 | Cell Phone | Text message from **MADDOX** to Person D |
| THIRTY-THREE | December 14, 2016 | Cell Phone | Text message from **MADDOX** to Person C |
| THIRTY-FOUR | January 25, 2017 | Cell Phone | Text message from **MADDOX** to Person D |
| THIRTY-FIVE | March 13, 3017 | Internet | E-mail from MADDOX to Person D |

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT THIRTY-SIX
### False Statements
### 18 U.S.C. § 1001 (a)(2)

On or about May 24, 2017, in the Northern District of Florida and

elsewhere, the defendant,

## SCOTT CHARLES MADDOX,

51

did knowingly and willfully make materially false, fictitious, and fraudulent

statements and representations in a matter within the executive branch of the

Government of the United States, that is, the defendant falsely stated that:

> a.   **MADDOX** had no connection to Governance;
>
> b.   the individuals associated with Company F never attempted to

pay **MADDOX** any money;

> c.   Company F representatives did not give **MADDOX** any gifts;

and

> d.   **MADDOX** had not known about how Company F found

**CARTER-SMITH** until May 24, 2017.

These statements and representations were false because, as **MADDOX** then

well knew:

> a.   **MADDOX** controlled Governance's finances, operations, and

client relationships;

> b.   the individuals associated with Company F did attempt to pay

**MADDOX**;

> c.   the individuals associated with Company F paid for

**MADDOX**'s flight to Las Vegas, and his hotel stay and meals in Las Vegas;

and

    d.    **MADDOX** himself instructed Company F to hire Governance.

In violation of Title 18, United States Code, Section 1001(a)(2).

**COUNT THIRTY-SEVEN**
**False Statements**
**18 U.S.C. § 1001(a)(2)**

On or about May 24, 2017, in the Northern District of Florida, the defendant,

**JANICE PAIGE CARTER-SMITH,**

did knowingly and willfully make a materially false, fictitious, and fraudulent

statement and representation in a matter within the executive branch of the

Government of the United States, that is, the defendant falsely stated that she was

the only person associated with Governance. This statement and representation

was false because, as **CARTER-SMITH** then well knew, **MADDOX** was

involved in and exerted control over Governance's finances, operations, and client

relationships.

In violation of Title 18, United States Code, Section 1001(a)(2).

**COUNT THIRTY-EIGHT**
**Conspiracy to Defraud the United States**
**18 U.S.C. § 371**

**I.  Introduction**

1.    Paragraphs 1 through 14, 21 through 27, 29, and 38 of Count One of

this Indictment are realleged and incorporated as though fully set forth herein.

53

2.     At all times relevant to this Indictment, the Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering the internal revenue laws of the United States.

## II.  The Charge

3.     Between in or about 2011 and on or about August 21, 2017, in the Northern District of Florida and elsewhere, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

did knowingly and willfully conspire, combine, confederate, and agree together and with other persons to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes.

## III.  Manner and Means

The manner and means by which the conspiracy was carried out included the following, among others:

4.     **MADDOX** and **CARTER-SMITH**, using deceit and dishonest means, presented false books and records to an accountant for use in preparing the corporate income tax returns of Governance and Gov. Services for the calendar years 2012 through 2016.

54

5.    **MADDOX** and **CARTER-SMITH** secretly sold Governance from **MADDOX** to **CARTER-SMITH** and failed to advise bookkeepers and accountants of the sale of Governance resulting in false documents and records being maintained for Governance and Gov. Services so as to conceal from the Internal Revenue Service **CARTER-SMITH**'s ownership and interest in Governance.

6.    **MADDOX** and **CARTER-SMITH** failed to disclose to their accountants the existence of a $475,000 interest-only promissory note payable to **MADDOX** by **CARTER-SMITH**, resulting in defendant **MADDOX** failing to report to the IRS interest income totaling approximately $108,418 on **MADDOX**'s 2011 through 2016 tax returns.

7.    **MADDOX** provided his accountants with false Arms-Length Affidavits in connection with two short-sale property transactions between the defendants occurring in 2011 and 2012.  The false affidavits caused the accountants to classify the transactions as third party sales and report false losses of $307,539 and $267,520 on **MADDOX**'s 2011 and 2012 tax returns, respectively.

8.    **MADDOX** carried these claimed false losses described in the preceding paragraph as net operating losses, which **MADDOX** carried forward on his 2013 through 2016 tax returns.

9.     **MADDOX** provided his accountants with a summary of expenses associated with his Schedule C business, Maddox Law Firm.  The summary falsely included $12,000 of rent expense paid by **MADDOX** to **CARTER-SMITH** for 510 N. Adams, **MADDOX**'s personal residence.  This schedule caused the accountants to falsely report the personal expense on **MADDOX**'s 2013 Schedule C.

## IV.  Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Northern District of Florida, and elsewhere:

10.     On or about March 12, 2010, **MADDOX** signed a contract selling Governance to **CARTER-SMITH**.  In or about April 2010, **CARTER-SMITH** became the president and registered agent of Governance.

11.     On or about August 22, 2011, SCM Investments, LLC and **MADDOX** sold 208 W. Carolina to Governance Services LLC via a short sale. This transaction was not a valid short sale because **MADDOX** and **CARTER-SMITH** were not "unrelated parties."  **MADDOX** obtained most of the funding for **CARTER-SMITH** to purchase the property from a Governance client and **MADDOX**'s family members.

12.     On or about August 9, 2012, **MADDOX** filed a 2011 tax return that falsely claimed a business property loss of $307,539 due to the short sale of 208 W. Carolina, and falsely reported income earned by Governance on Schedule E of his Form 1040.

13.     On or about September 14, 2012, **MADDOX** filed, or caused to be filed, a 2011 Form 1120S for Governance, which he falsely signed as president and sole shareholder of the company.

14.     On or about October 1, 2012, **CARTER-SMITH** filed, or caused to be filed, a false 2011 Form 1040.

15.     On or about December 14, 2012, MAL sold 510 N. Adams to Gov. Services via a short sale, which was not a valid short sale because **CARTER-SMITH** was the owner of both MAL and Gov. Services.

16.     On or about July 1, 2013, **MADDOX** filed, or caused to be filed, a false 2012 Form 1120S for Governance Inc., which he falsely signed as president and sole shareholder of the company.

17.     On or about July 2, 2013, **MADDOX** filed, or caused to be filed, a false 2012 Form 1040 that falsely claimed business property loss of $267,520 and falsely reported income earned by Governance on Schedule E.

18.     On or about October 16, 2013, **CARTER-SMITH** filed, or caused to be filed, a false 2012 Form 1040.  The Form 1040 was false in that it failed to report pass through income earned from Governance on Schedule E.

19.     Between on or about September 29, 2014, and on or about August 21, 2017, **MADDOX** filed, or caused to be filed, false Form 1040s for tax years 2013 through 2016 that falsely reported net operating losses ranging from $126,000 to $273,000 from fraudulent property short-sales.

20.     On or about July 9, 2014, during a sworn interview by a Florida Commission on Ethics investigator, **CARTER-SMITH** lied about the financial status of Governance when she purchased the company, falsely stating, "it had incurred some losses the years before."

21.     Between 2015 and 2017, **MADDOX** used Governance credit cards in the names of other individuals but did not declare this income received from Governance on his Forms 1040 filed with the IRS during this time.

22.     Between 2011 and 2014, **MADDOX** lied to his bookkeeper regarding the timing and sale of Governance.

All in violation of Title 18, United States Code, Section 371.

## COUNT THIRTY-NINE
### Making False Statements on a Tax Return
### 26 U.S.C. § 7206(1)

On or about July 2, 2013, in the Northern District of Florida and elsewhere, the defendant,

### SCOTT CHARLES MADDOX,

a resident of Tallahassee, Florida, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2012, which contained and was verified by a written declaration that it was made under the penalties of perjury, and which the defendant did not believe to be true and correct as to every material matter. That return, which was filed with the Internal Revenue Service, was false in that the return represented a loss on line 14 of $267,520 from the sale of property owned by Governance, falsely listed $92,609 of Governance income on Schedule E line 28c, falsely listed $3,372 of Governance rental income on Schedule E line 28d, and failed to list on line 8a interest income of $23,976, when, in truth and fact and as the defendant then well knew, he had sold Governance to **CARTER-SMITH** more than three years earlier, had no legal interest in Governance, could not deduct any losses from Governance, and he could not report Governance's income on his Form 1040 because he had no legal interest in the business. The Form 1040 filed by **MADDOX** was also false in that

59

he failed to report $23,976 in interest income that he had received from **CARTER-SMITH** during the 2012 tax year.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FORTY
### Making False Statements on a Tax Return
### 26 U.S.C. § 7206(1)

On or about September 29, 2014, in the Northern District of Florida and elsewhere, the defendant,

## SCOTT CHARLES MADDOX,

a resident of Tallahassee, Florida, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2013, which contained and was verified by a written declaration that it was made under the penalties of perjury, and which the defendant did not believe to be true and correct as to every material matter.  That return, which was filed with the Internal Revenue Service, was false in that the return represented a net operating loss on line 21 of $273,761, failed to list on line 8a interest income of $17,950, and falsely listed on line 20b on Schedule C $12,000 of personal rent (which reduced Business Income the same on line 12), when in truth and fact and as the defendant then well knew, he had sold Governance to **CARTER-SMITH** more than three years earlier, had no legal interest in Governance, could not deduct any losses from Governance, and he was not entitled to a net operating loss from Governance because he had no

60

legal interest in the business.  The Form 1040 filed by **MADDOX** was also false in that the defendant failed to report $17,950 in interest income that he had received from **CARTER-SMITH** during the 2013 tax year, and the defendant was not entitled to deduct personal rent expense on his return.

In violation of Title 26, United States Code, Section 7206(1).

**COUNT FORTY-ONE**
**Making False Statements on a Tax Return**
**26 U.S.C. § 7206(1)**

On or about October 19, 2015, in the Northern District of Florida and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

a resident of Tallahassee, Florida, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2014, which contained and was verified by a written declaration that it was made under the penalties of perjury, and which the defendant did not believe to be true and correct as to every material matter.  That return, which was filed with the Internal Revenue Service, was false in that the return represented a net operating loss on line 21 of $252,733 and failed to list on line 8a interest income of $17,097, when in truth and fact and as the defendant then well knew, he had sold Governance to **CARTER-SMITH** more than four years earlier, had no legal interest in Governance, could not deduct any losses from Governance because he had no interest in the business,

61

and he was not entitled to a net operating loss.  The Form 1040 filed by **MADDOX** was also false in that he failed to report $17,097 in interest income that he had received from **CARTER-SMITH** during the 2014 tax year.

In violation of Title 26, United States Code, Section 7206(1).

**COUNT FORTY-TWO**
**Making False Statements on a Tax Return**
**26 U.S.C. § 7206(1)**

On or about October 20, 2016, in the Northern District of Florida and elsewhere, the defendant,

**SCOTT CHARLES MADDOX,**

a resident of Tallahassee, Florida, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2015, which contained and was verified by a written declaration that it was made under the penalties of perjury, and which the defendant did not believe to be true and correct as to every material matter.  That return, which was filed with the Internal Revenue Service, was false in that the return included in line 21 a net operating loss of $197,184 and failed to list in line 8a interest income of $13,485, when in truth and fact and as the defendant then well knew, he had sold Governance to **CARTER-SMITH** more than five years earlier, had no legal interest in Governance, could not deduct any losses from Governance because he had no legal interest in the business, and he was not entitled to a net operating loss.  The Form 1040 filed by

62

**MADDOX** was also false in that he failed to report $13,485 in interest income that

he received had from **CARTER-SMITH** during the 2015 tax year.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FORTY-THREE
### Making False Statements on a Tax Return
### 26 U.S.C. § 7206(1)

On or about August 21, 2017, in the Northern District of Florida and

elsewhere, the defendant,

### SCOTT CHARLES MADDOX,

a resident of Tallahassee, Florida, did willfully make and subscribe a United States

Individual Income Tax Return, Form 1040, for the calendar year 2016, which

contained and was verified by a written declaration that it was made under the

penalties of perjury, and which the defendant did not believe to be true and correct

as to every material matter.  That return, which was filed with the Internal Revenue

Service, was false in that the return represented a net operating loss on line 21 of

$126,805 and failed to list on line 8a interest income of $12,749, when, in truth and

fact and as the defendant then well knew, he had sold Governance to **CARTER-**

**SMITH** more than six years earlier, had no legal interest in Governance, could not

deduct any losses from Governance, and he was not entitled to a net operating loss.

The Form 1040 filed by **MADDOX** was also false in that he failed to report

63

$12,749 in interest income that he had received from **CARTER-SMITH** during the 2016 tax year.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT FORTY-FOUR
### Making False Statements on a Tax Return
### 26 U.S.C. § 7206(1)

On or about October 16, 2013, in the Northern District of Florida and elsewhere, the defendant,

### JANICE PAIGE CARTER-SMITH,

a resident of Tallahassee, Florida, did willfully make and subscribe a United States Individual Income Tax Return, Form 1040, for the calendar year 2012, which contained and was verified by a written declaration that it was made under the penalties of perjury, and which the defendant did not believe to be true and correct as to every material matter.  That return, which was filed with the Internal Revenue Service, was false in that the return falsely represented total Schedule E income on line 17 of only $53,398 from The Big Productions, Inc., and omitted approximately $95,981 in income from Governance.

In violation of Title 26, United States Code, Section 7206(1).

### CRIMINAL FORFEITURE

The allegations contained in Counts One through Thirty-Five of this Indictment are hereby realleged and incorporated by reference for the purpose of

64

alleging forfeiture.  From their engagement in the violations alleged in Counts One through Thirty-Five of this Indictment, the defendants,

**SCOTT CHARLES MADDOX**
**and**
**JANICE PAIGE CARTER-SMITH,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2), and 1963(a)(3), and Title 28, United States Code, Section 2461(c), any and all of the defendants' right, title, and interest in any property, real and personal, constituting, and derived from, proceeds traceable to such offenses, and pursuant to Title 18, United States Code, Section 1963(a)(1), any interest the defendants have acquired and maintained, in violation of Section 1962.

If any of the property described above as being subject to forfeiture, as a result of acts or omissions of the defendants:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred, sold to, or deposited with a third party;

  c. has been placed beyond the jurisdiction of this Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property that cannot be

    subdivided without difficulty,

65

it is the intent of the United States, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 18, United States Code, Sections 982 and

1963, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any

other property of said defendants up to the value of the forfeitable property.

A TRUE BILL:

REDACTED

FOREPERSON

12/11/18

DATE

KAREN RHEW-MILLER
Attorney for the United States
Acting Under Authority
Conferred by 28 U.S.C. § 515

STEPHEN M. KUNZ
Assistant United States Attorney

ANNALOU TIROL
Acting Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

SIMON CATALDO
Trial Attorney
U.S. Department of Justice

PETER M. NOTHSTEIN
Trial Attorney
U.S. Department of Justice

66